**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PATRICK AYERS, Derivatively on Behalf of HASBRO, INC.,<br><br>Plaintiff,<br>v.<br><br>CHRISTIAN P. COCKS, RICHARD S. STODDART, HOPE F. COCHRAN, LISA GERSH, ELIZABETH HAMREN, BLAKE J. JORGENSEN, LAUREL J. RICHIE, MARY BETH WEST, MICHAEL R. BURNS, TRACY A. LEINBACH, LINDA K. ZECHER HIGGINS, KENNETH A. BRONFIN, EDWARD M. PHILIP, GINA GOETTER, DEBORAH M. THOMAS, and ERIC NYMAN,<br><br>Individual Defendants,<br>-and-<br><br>HASBRO, INC.,<br><br>Nominal Defendant. | Case No. 1:25-cv-1504<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Patrick Ayers ("**Plaintiff**"), by his attorneys, derivatively on behalf of Nominal Defendant Hasbro, Inc. ("**Hasbro**" or the "**Company**") submits this Verified Stockholder Derivative Complaint against individual defendants Christian P. Cocks, Richard S. Stoddart, Hope F. Cochran, Lisa Gersh, Elizabeth Hamren, Blake J. Jorgensen, Laurel J. Richie, Mary Beth West, Michael R. Burns, Tracy A. Leinbach, Linda K. Zecher Higgins, Kenneth A. Bronfin, Edward M. Philip, Gina Goetter, Deborah M. Thomas, and Eric Nyman (collectively, the "**Individual Defendants**") for breaches of fiduciary duties as directors and/or officers of Hasbro, unjust enrichment, and violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff's allegations are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other

things, a review of public filings with the U.S. Securities & Exchange Commission ("**SEC**") and a review of news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**<u>NATURE AND SUMMARY OF THE ACTION</u>**

1. This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Hasbro against members of its board of directors (the "**Board**") and members of the Company's upper management. The wrongdoing alleged herein has caused substantial damage to Hasbro's reputation, goodwill, and standing in the business community and has exposed Hasbro to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Hasbro in the form of, among other things, millions of dollars in losses to the Company's market capitalization. This action seeks to remedy wrongdoing committed by Hasbro's directors and officers from February 7, 2022, through the present (the "**Relevant Period**").

2. Hasbro is a leading toy, game and entertainment company with global reach. During the Relevant Period, Hasbro sold a broad selection of consumer products including toys, games, apparel, and music. The Company also offers digital content for its iconic brands, which include Dungeons & Dragons, Magic: The Gathering, Hasbro Gaming, NERF, Transformers, Play-Doh, G.I. Joe, Monopoly, My Little Pony, and Peppa Pig.

3. During the early stages of the COVID-19 pandemic, prior to the start of the Relevant Period, Hasbro faced an increase in demand as families locked down in their homes, and global supply chain disruptions impacted numerous industries. In response, Hasbro overpurchased inventory to ensure that it could meet demand. As Defendant Deborah M. Thomas ("**Thomas**"), the Company's former Chief Financial Officer ("**CFO**"), explained to investors on July 26, 2021:

"We've increased retail inventory in the places where we couldn't have inventory a year ago. We just couldn't get it and we couldn't ship it, so retailers were selling out of everything."

4. When the Relevant Period began, Defendants represented to investors that Hasbro's inventory was of a high quality and that the Company was appropriately building up its inventory balances to mitigate supply chain risk and meet consumer demand, especially for the 2022 holiday season. For example, on February 7, 2022, Defendant Thomas clamed that "[t]he inventory we had at year-end is of very high quality." Throughout the Relevant Period, Defendants represented that the rising inventory levels reported in the Company's periodic financial reports filed with the SEC during the Relevant Period reflected outstanding and anticipated demand, rather than excess supply that outpaced waning demand.

5. Defendants' Relevant Period representations that Hasbro's inventories were of high quality and at appropriate levels were false. In truth, Defendants knew that Hasbro had overpurchased inventory to an extent that significantly outpaced customer demand.

6. The truth began to emerge on January 26, 2023, when the Company previewed its fourth quarter results for fiscal year 2022. Hasbro, having repeatedly touted the apparent strength of its inventory to combat weakening sales, now admitted that revenue would contract by 17% year-over-year. The Company also announced it would be laying off 15% of its global workforce, and at the same time disclosed the immediate departure of its Chief Operating Officer ("**COO**"), Defendant Eric Nyman ("**Nyman**").

7. As a result of these disclosures, the price of Hasbro common stock declined by $5.17, or 8.1%, from a closing price of $63.78 per share on January 26, 2023 to a closing price of $58.61 per share on January 27, 2023.

8. At the same time, however, Hasbro made false, reassuring statements to investors concerning the extent of the Company's inventory buildup. For example, on April 27, 2023, Hasbro's Chief Executive Officer ("**CEO**"), Defendant Christian P. Cocks ("**Cocks**"), claimed that Hasbro had made "good progress on reducing retailer inventories and [was] on track for healthy improvements in [its] owned inventory."

9. Then, on October 26, 2023, before the market opened, Hasbro shocked investors when it announced its financial results for the third quarter of its 2023 fiscal year, and disclosed an 18% decline in Consumer Product revenues year-over-year, along with a significant reduction in guidance for the remainder of the year. In the attendant earnings call, Defendant Gina Goetter ("**Goetter**"), Hasbro's current CFO, revealed that the Company was forecasting "$50-ish million of onetime cost" that was to be spent on "mov[ing] through inventory at the retailer level, extra marketing to move through the inventory, [and] extra obsolescence cost" in its Consumer Products segment.

10. As a result of these disclosures, Hasbro's stock price declined by $6.38 per share, or 11.7%, from a closing price of $54.75 per share on October 25, 2023, to a closing price of $48.37 per share on October 26, 2023, erasing approximately $831 million in shareholder value.

11. As detailed herein, and as alleged in the ongoing federal securities class action in the United States District Court for the Southern District of New York styled *West Palm Beach Firefighters' Pension Fund v. Hasbro, Inc. et al*., Case No. 1:24-cv-08633 (S.D.N.Y) (the "**Securities Class Action**"), Hasbro's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C.

§78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

15. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391 because Defendants have conducted business in this District and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

## THE PARTIES

### Plaintiff

17. Plaintiff Patrick Ayers is and has continuously been a stockholder of Hasbro during the wrongdoing complained of herein.

### Nominal Defendant

18. Defendant Hasbro is a Rhode Island corporation with its principal executive offices located at 1027 Newport Avenue, Pawtucket, Rhode Island 02861. Hasbro's shares trade on the Nasdaq Global Select Market ("**NASDAQ**") under the ticker symbol "HAS."

**Director Defendants**

19. Defendant Cocks has served as Hasbro's CEO and as a board member since February 2022. According to the Company's public filings, in 2023, Defendant Cocks received $15,110,869 in compensation from the Company. As of March 11, 2024, Defendant Cocks beneficially owned 304,007 shares of Hasbro stock, worth nearly $16 million.[1]

20. Defendant Richard S. Stoddart ("**Stoddart**") has served as a Company director since 2014 and as Chair of the Board since 2022. He previously served as the Company's interim CEO from October 2021 until February 2022. He is a member of the Compensation Committee and the Nominating, Governance and Social Responsibility Committee. As of March 11, 2024, Defendant Stoddart beneficially owned 51,999 shares of Hasbro stock, worth roughly $2.7 million.

21. Defendant Hope F. Cochran ("**Cochran**") has served as a Company director since 2016. She is also the Chair of the Finance and Capital Allocation Committee, and is a member of the Audit and Cybersecurity Committee and the Data Privacy Committee. According to the Company's public filings, in 2023, Defendant Cochran received $338,494 in compensation from the Company. As of March 11, 2024, Defendant Cochran beneficially owned 15,568 shares of Hasbro stock, worth approximately $818,409.

22. Defendant Lisa Gersh ("**Gersh**") has served as a Company director since 2010. She is Chair of the Compensation Committee and is a member of the Nominating, Governance and Social Responsibility Committee. She also served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, in 2023, Defendant Gersh received $334,885 in compensation from the Company. As of March 11, 2024, Defendant Gersh beneficially owned 71,176 shares of Hasbro stock, worth roughly $3.7 million.

---

[1] Valuations of the Individual Defendants' personal holdings of Company stock are based on the $52.57 per share closing price of Hasbro stock on March 11, 2024.

23. Defendant Elizabeth Hamren ("**Hamren**") has served as a Company director since 2022. She is a member of the Compensation Committee and the Cybersecurity and Data Privacy Committee. According to the Company's public filings, in 2023, Defendant Hamren received $297,544 in compensation from the Company. As of March 11, 2024, Defendant Hamren beneficially owned 5,102 shares of Hasbro stock, worth approximately $268,212.

24. Defendant Blake J. Jorgensen ("**Jorgensen**") has served as a Company director since 2022. He is Chair of the Audit Committee and is a member of the Finance and Capital Allocation Committee. According to the Company's public filings, in 2023, Defendant Jorgensen received $314,944 from the Company. As of March 11, 2024, Defendant Jorgensen beneficially owned 5,102 shares of Hasbro stock, worth approximately $268,212.

25. Defendant Laurel J. Richie ("**Richie**") has served as a Company director since 2020. She is a member of the Compensation Committee and the Nominating, Governance and Social Responsibility Committee. According to the Company's public filings, in 2023, Defendant Richie received $297,544 in compensation from the Company. As of March 11, 2024, Defendant Richie beneficially owned 7,553 shares of Hasbro stock, worth approximately $397,061.

26. Defendant Mary Beth West ("**West**") has served as a Company director since 2016. She is Chair of the Nominating, Governance and Social Responsibility Committee and is a member of the Finance and Capital Allocation Committee. According to the Company's public filings, in 2023, Defendant West received $311,344 in compensation from the Company. As of March 11, 2024, Defendant West beneficially owned 15,568 shares of Hasbro stock, worth roughly $818,410.

**Former Director Defendants**

27. Defendant Michael R. Burns ("**Burns**") served as a Company director from 2014 until May 2024. According to the Company's public filings, in 2023, Defendant Burns received

$295,044 in compensation from the Company. As of March 11, 2024, Defendant Burns beneficially owned 21,211 shares of Hasbro stock, worth roughly $1.1 million.

28. Defendant Tracy A. Leinbach ("**Leinbach**") served as a Company director from 2008 until May 2024. According to the Company's public filings, Defendant Leinbach received $320,044 in 2023 in compensation from the Company. As of March 11, 2024, Defendant Leinbach beneficially owned 39,960 shares of Hasbro stock, worth roughly $2.1 million.

29. Defendant Linda K. Zecher Higgins ("**Higgins**") served as a Company director from 2014 until May 2024. According to the Company's public filings, in 2023, Defendant Higgins received $310,044 from the Company. As of March 11, 2024, Defendant Higgins beneficially owned 27,853 shares of Hasbro stock, worth roughly $1.5 million.

30. Defendant Kenneth A. Bronfin ("**Bronfin**") served as a Company director from 2008 until May 2023.

31. Defendant Edward M. Philip ("**Philip**") served as a Company director from 2002 until May 2023.

**<u>Officer Defendants</u>**

32. Defendant Goetter has served as Hasbro's CFO since May 2023. Defendant Goetter is named as a defendant in the Securities Class Action. According to the Company's public filings, in 2023, Defendant Goetter received $5,710,001 in compensation from the Company. As of March 11, 2024, Defendant Goetter beneficially owned 108,408 shares of Hasbro stock, worth roughly $5.7 million.

33. Defendant Thomas served as Hasbro's CFO from May 2009 until May 2023. Defendant Thomas is named as a defendant in the Securities Class Action. According to the Company's public filings, in 2023, Defendant Thomas received $7,837,079 in compensation from

the Company. As of March 11, 2024, Defendant Thomas beneficially owned 269,072 shares of Hasbro stock, worth roughly $14.1 million.

34. Defendant Nyman served as Hasbro's COO from February 2022 until March 2023. Defendant Nyman is named as a defendant in the Securities Class Action. According to the Company's public filings, in 2023, Nyman received $5,824,913 in compensation from the Company. As of March 11, 2024, Defendant Nyman beneficially owned 50,940 shares of Hasbro stock, worth roughly $2.7 million.

35. The Individual Defendants, because of their positions with Hasbro, possessed the power and authority to control the contents of Hasbro's reports to the SEC, press releases, and other public statements. Each of the Individual Defendants was provided with copies of the Company's public filings and statements alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

**Relevant Non-Parties**

36. Frank D. Gibeau ("**Gibeau**") has served as a Company director since March 2024.

37. Darin S. Harris ("**Harris**") has served as a Company director since March 2024.

38. Owen Mahoney ("**Mahoney**") has served as a Company director since March 2024.

## SUBSTANTIVE ALLEGATIONS

**Background**

39. Hasbro is a multinational toy and entertainment company that manufactures and distributes, *inter alia*, action figures, board games, and video games. The Company operates

through four reportable segments: (i) Consumer Products; (ii) Wizards of the Coast and Digital Gaming;[2] (iii) Entertainment; and (iv) Corporate and Other. The Consumer Products segment "engages in the sourcing, marketing and sales of toy and game products around the world" and accounted for roughly 62%, 60%, and 58% of the Company's total revenues in 2021, 2022, and 2023, respectively.

40. At the start of the COVID-19 pandemic, demand for the Company's products was temporarily heightened as a result of lockdowns and stay-at-home orders. Fearing supply chain disruptions related to the pandemic, Hasbro purchased and accumulated excess inventories to ensure that the Company maintained sufficient product to keep up with the rising demand. As Defendant Thomas explained to investors on July 26, 2021, "We've increased retail inventory in the places where we couldn't have inventory a year ago. We just couldn't get it and we couldn't ship it, so retailers were selling out of everything."

41. Throughout the Relevant Period, Hasbro's inventory levels were of significant concern to investors and the public. While the Individual Defendants consistently represented that they expected demand trends to continue and that the Company was well-positioned due to its high inventory levels, the heightened demand for the Company's products was a temporary and unsustainable result of the COVID-19-related lockdowns. Accordingly, contrary to repeated statements by the Individual Defendants, Hasbro's inventories were not of "good quality" and far exceeded customer demand.

**The Individual Defendants' False and Misleading Statements**

42. On February 7, 2022, during the Company's fourth quarter 2021 earnings call, Defendant Thomas represented that "[t]he inventory we had at year end is of very high quality,"

[2] Wizards of the Coast is a subsidiary of Hasbro known for several popular gaming franchises including Dungeons & Dragons and Magic: The Gathering.

and the Company's "aged inventory is well below historical levels." Defendant Thomas further stated that the Company's high inventory level "reflects a significant increase in the amount of inventory in transit as lead times from China have increased about three times on average."

43. Defendant Thomas continued, explaining that the higher inventory levels were "really because of inventory in transit and the input and freight costs that are capitalized in that inventory. Now, the good part is what's in transit is our new spring releases for MAGIC and for our Consumer Products business. So, it's of excellent quality and it is being slightly impacted, though, by those higher input costs as we think about inventory."

44. On February 23, 2022, Hasbro filed its 2021 annual report on Form 10-K with the SEC (the "**2021 10-K**"), which was signed by Defendants Stoddart, Thomas, Leinbach, Bronfin, Burns, Cochran, Gersh, Philip, Richie, West, and Higgins. The 2021 10-K disclosed that "[i]nventories increased 40% in 2021 compared to 2020 reflecting increased lead-times from supply chain disruptions, as well as higher freight-in costs[.]" The 2021 10-K further stated: "we believe the manufacturing capacity of our third-party manufacturers, as well as the supply of components, accessories and completed products which we purchase from unaffiliated manufacturers, are adequate to meet the anticipated demand in 2022 for our products."

45. On April 19, 2022, Hasbro issued a press release announcing financial results for its first quarter of 2022, which stated that, "[w]hile inventory was of high quality, general supply chain disruptions caused longer in transit times, and earlier purchasing to mitigate out-of-stock situations, lead to an increase in inventory." During the earnings call hosted by the Company that day (the "**1Q22 Earnings Call**"), Defendant Thomas stated that to "improve product in stocks this holiday season versus last, we're advancing deliveries of key items in our owned inventory so that we can ensure it's on hand."

46. Also, during the 1Q22 Earnings Call, Defendant Nyman claimed that "our Hasbro inventories are in good shape" and "[o]ur retail inventories are in good shape as well." Defendant Nyman continued, stating that "[q]uality is good," and that "knowing that we're in pretty good shape there, we feel at this point pretty good . . . about our inventories going into the back half." Defendant Cocks stated that "we feel pretty good about where we're going into for Q2, Q3, and Q4, which is why we're maintaining our guidance" and "we think that inventory is filled with great products[.]"

47. On July 19, 2022, Hasbro issued a press release announcing financial results for the second quarter of 2022, which claimed that "[i]nventory is of high quality and supply is well positioned to meet demand" and quoted Defendant Thomas as stating that "[i]n the first half of the year, we took significant steps to secure inventory to help ensure product availability for upcoming product launches, major entertainment releases and the holiday season[.]"

48. During the earnings call hosted by the Company that day (the "**2Q22 Earnings Call**"), Defendant Cocks stated, in relevant part, as follows:

> While our inventory levels are up year over year at the end of Q2, the inventory is of high quality, positioning us to meet consumer demand and promote our new product innovation aggressively. For instance, our early read on our first of two Prime Days at Amazon last week is positive, with consumer deal takeaway up 20% year over year. Our newest game announcement, Wordle: The Party Game, is off to a record start for gaming pre-orders. As such, we expect inventory by year end to be approximately flat year over year and to see reductions in on-hand supply by the end of Q3.

49. Defendant Cocks added: "[W]e feel like that inventory is very high quality and has a lot of upside potential for us in terms of POS."

50. Also, during the 2Q22 Earnings Call, Defendant Thomas stated the following regarding the Company's inventory levels and supply chain management:

> We proactively managed our supply chain and inventory purchases to mitigate disruption. We're much better positioned to meet demand this year versus last. This action resulted in higher-than-typical inventory levels at Hasbro for this time of the year. To avoid the out-of-stock positions of the last year holiday season due to supply chain disruptions, retailers also shifted some consumer product direct shipments into the second quarter from the third quarter. Both our inventory and that of retail is of extremely high quality.

51. Defendant Thomas added that "based on our plan to drive point-of-sale growth in the second half of the year, we believe we will end the year with inventory levels similar to year-end 2021."

52. On October 18, 2022, during the Company's third quarter 2022 earnings call (the "**3Q22 Earnings Call**"), Defendant Thomas assuaged investor concerns related to Hasbro's inventory levels, stating that "our inventory continues to be of high quality, but our goal is to work down the balance by year-end[.]" Defendant Thomas further explained that "retail inventory is up, as we said, at the end of the quarter, but it's of good quality. And we have a lot of promotional activity planned for the fourth quarter . . .we're working with our retailers on promotional activity, and much of it was setting for a lot of this new innovation that we're having in the fourth quarter."

53. Also, during the 3Q22 Earnings Call, Defendant Nyman stated that "we pride ourselves on making sure that we continue to stay ahead of our inventory situation." Defendant Nyman also claimed: "I expect Q4 to be in line with where we've been and we'll work through our inventory again to finish the year in that low to mid-single-digit area that we talked about. And that's what is built into our story that we've already discussed this morning."

54. The statements above were materially false and misleading because, *inter alia*, they failed to disclose that: (i) the Company's inventories were not of "good quality"; (ii) Hasbro's inventories far exceeded customer demand; (iii) Hasbro was struggling to manage its excess

inventories; (iv) demand for the Company's products was temporarily inflated at the start of the COVID-19 pandemic and, once people started returning to school and work, customer demand stagnated; (v) the Company's high inventory levels throughout the Relevant Period were not an accurate reflection of underlying demand; and (vi) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

55. On January 26, 2023, the Company issued a press release providing preliminary financial results for the fourth quarter of 2022 (the "**4Q22 Release**"). The 4Q22 Release reported 17% year-over-year decline in revenues for the fourth quarter of 2022 and quoted Defendant Cocks, who admitted that the Company's "Consumer Products business underperformed in the fourth quarter against the backdrop of a challenging holiday consumer environment." The 4Q22 Release further disclosed that Hasbro was planning "leadership and organizational changes, including the elimination of approximately 15% of its global workforce this year" and announced the departure of Defendant Nyman from the Company.

56. On this news, the price of Hasbro stock declined by 8.1% in one trading day, from a close of $63.78 per share on January 26, 2023, to a close of $58.61 per share on January 27, 2023. The price of Hasbro stock remained artificially inflated, however, as the Individual Defendants continued to obscure the truth.

57. For instance, during the Company's fourth quarter 2022 earnings call on February 16, 2023 (the "**4Q22 Earnings Call**"), Defendant Cocks stated that the Company "made progress on both our owned and retailed inventory in the fourth quarter[.]" He also claimed that the Company viewed its retail inventory as "not unhealthy, but still having a little bit of an overhang

given the slowing consumer demand that we saw in Q4." Also during the 4Q22 Earnings Call, Defendant Thomas characterized the Company's excess inventory as typical, stating that "[w]e do have some additional inventory. We'll be looking at closing out over the course of this year. That's built into our assumptions. We have that every year."

58. During the 4Q22 Earnings Call, Defendant Thomas continued to downplay the impact of the Company's inventory levels, stating the following:

> And our inventory build, if we look at it, a big piece of it was preparing for the early releases of MAGIC: THE GATHERING, and making sure we had paper on stock to print because that was in shortage -- short supply last year. So, as we look at that, the closeouts that are in our owned inventory, we see sending -- selling those out at the right time for both us and for retailers to maximize the profit on that.

59. On April 27, 2023, Hasbro issued a press release announcing its financial results for the first quarter of 2023, which quoted Defendant Thomas as stating that "[t]he year has started on plan as we reduce retail inventory levels and remain positioned to drive continued margin expansion." During the earnings call hosted by the Company that day, Defendant Cocks explained that the Company had made "good progress on reducing retailer inventories and [was] on track for healthy improvements in [its] owned inventory in Q2 and Q3." Specifically, Defendant Cocks explained that for "owned inventories, we made progress outside of Action Figures and Wizards in Q1, and we expect that to continue."

60. On May 22, 2023, at the J.P. Morgan Global Technology, Media and Communications Conference, Defendant Cocks stated the following with respect to the Company's inventory levels:

> [W]e saw good progress in Q1, cleaning up our retailer inventories. And our inventories of retail were down 15% by the end of Q1. We think we'll be a fully clean level, mostly by the end of Q2. There might be a couple brands here or there, a couple of SKUs that we

> need to go into Q3 on. But if anything, our situation at retail right now is we have too little inventory rather than too much.

61. On August 3, 2023, Hasbro issued a press release reporting financial results for the second quarter of 2023, which quoted Defendant Cocks as touting "a solid second quarter, with revenue ahead of our expectations, significant reduction of inventory, and meaningful progress toward our transformation and cost savings programs[.]"

62. During the related earnings call hosted by the Company that day, Defendant Cocks highlighted Hasbro's "much improved inventory levels[,]" stating that "[o]ur inventories are greatly improved" and that "it's nice to have clean inventories and inventories reduced." Defendant Cocks also stated that "we feel like our retailer inventory is at a pretty productive level." Defendant Goetter reiterated these sentiments, claiming during the call that Hasbro "made significant progress in lowering inventory levels."

63. On September 6, 2023, at the Goldman Sachs Communacopia and Technology Conference, Defendant Goetter stated the following with respect to Hasbro's inventory levels:

> [W]e're down 16% per our own inventory, down about the same with the retail inventory, but within that, when you look at our Toy business, it was down about 24%. And we said for the year, our goal is to bring our inventory levels down to 20%. In terms of does that get us back to normal or healthy, it gets us pretty darn close.

64. On October 26, 2023, the Company released third quarter 2023 financial results, disclosing an 18% year-over-year decline in Consumer Product revenues "driven by exited businesses, soft industry trends and prioritization of inventory management across both owned and retail inventory." The Company additionally revised its full year revenue guidance downward, from a decline in the range of 3% to 6% to a decline in the range of 13% to 15%, which Hasbro attributed to a decline in Consumer Product revenues.

65. During the earnings call hosted by the Company that day, Defendant Goetter disclosed that Hasbro was expecting to incur a "$50-ish million [] onetime cost" related to "mov[ing] through inventory at the retailer level, extra marketing to move through the inventory, [and] extra obsolescence cost" in its Consumer Products segment.

66. On this news, the price of Hasbro stock declined 11.7% per share, from a close of $54.75 per share on October 25, 2023, to a close of $48.37 per share on October 26, 2023.

***Stock Repurchases During the Relevant Period***

67. According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed herein, the Individual Defendants caused the Company to repurchase 1,428,852 shares of its own stock between April 1, 2022 and July 31, 2022, for a total price of $124,975,184.

68. Given that the price of Hasbro stock was trading at $48.37 after the corrective disclosures on May 1, 2024, the true value of the 1,428,852 repurchased shares was roughly $69.1 million. Accordingly, the Individual Defendants caused the Company to overpay by nearly $56 million to repurchase these shares.

## FIDUCIARY DUTIES

69. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Hasbro and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Hasbro in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Hasbro and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

70. Each Individual Defendant owed and continues to owe Hasbro and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

71. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Hasbro, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Hasbro, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

72. To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a) Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Rhode Island and the United States pursuant to the Company's Code of Conduct;

(c) Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d) Remain informed as to how Hasbro conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(e) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Hasbro, as well as procedures for reporting said reports and records to the Board, and periodically investigate, or cause independent investigation to be made of, said reports and records;

(f) Maintain and implement an adequately functioning system of internal, legal, financial, and management controls such that Hasbro's operations comply with all applicable laws and that the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders are accurate;

(g) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports of information that the Company was required by law to disseminate;

(h) Examine and evaluate any reports of examination, audits, or other information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subject and duties set forth above; and

(i) Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

73. The Individual Defendants, because of their positions of control and authority at the Company, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein and the content of the various public statements issued by Hasbro.

74. At all times relevant hereto, the Individual Defendants were the agents of each other and of Hasbro and were at all times acting within the scope of such agency.

**Duties Pursuant to the Company's Code of Business Conduct**

75. The Individual Defendants, as officers and/or directors of Hasbro, were bound by the Company's Corporate Code of Conduct[3] (the "**Code of Conduct**"), which required the following regarding the creation and maintenance of business records:

> All of us contribute to the process of recording financial and non-financial information. Business partners, government and regulatory officials and the public rely on our accurate and thorough disclosures and business records. Such information is also essential within Hasbro so that we can make good decisions.
>
> - Be open, honest and accurate when creating business records.
> - Never make false or dishonest entries about our business and performance – good or bad.
> - Unrecorded funds or assets are never acceptable.
> - Ensure all transactions are properly authorized.
> - Follow applicable laws and policies when creating, retaining or destroying documents including those in electronic formats.
>
> [* * *]

76. The "Communicating with the Public" section of the Code of Conduct states the following:

[3] *See* Hasbro, Inc.'s Corporate Code of Conduct at: https://investor.hasbro.com/static-files/2722f3e8-cc12-407a-977f-7d79c6102004.

> When we share information with the public, it is important that we do so carefully and that we are consistent and speak with one, clear voice.
>
> - If you are involved in preparing documents for public communications or filings with government agencies, always strive to be clear, objective, fair, accurate, complete, and timely.
> - If you're contacted by the media or by members of the investment community, contact the Public Relations or Investor Relations Department.
> - You should never publicly comment on legal matters, or other extraordinary events, without the approval of the Legal Department or Public Relations Department.
> - External presentations are an excellent way to share our expertise with others, but they must be reviewed by local management and may need to be reviewed in advance by the Legal Department and the Public Relations Department.

**Duties Pursuant to the Audit Committee Charter**

77. In addition to these duties set forth in the Code of Conduct, Defendants Cochran, Gersh, and Jorgensen (the "**Audit Committee Defendants**") who served on the Audit Committee during the Relevant Period, owed specific duties to Hasbro under the Charter of the Audit Committee of The Board of Directors of Hasbro, Inc. (the "**Audit Charter**").[4] Specifically, the Audit Charter described the purpose of the Audit Committee as follows:

> (a) appoint the independent auditor and oversee the independent auditor's work, (b) prepare the report required to be included in the Company's annual proxy statement by the rules of the Securities and Exchange Commission and (c) assist the Board of Directors (the "Board") of the Company in its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications and independence, and (iv) the performance of the Company's internal audit function and independent auditor.
>
> In discharging its oversight role, the Committee is empowered to investigate any matter with full access to all books, records, facilities and personnel of the Company and the power to retain outside counsel, auditors or other experts for this purpose. The Board and the Committee are in place to represent the Company's

[4] *See* Audit Charter (July 2024), https://investor.hasbro.com/static-files/59842676-99da-4564-9292-c151fd64b200.

> shareholders; accordingly, the independent auditor is ultimately accountable to the Board and the Committee.
>
> The Committee shall review and reassess the adequacy of this Charter on an annual basis.

78. The "Oversight of the Audit Process and the Company's Compliance and Risk Management" section of the Audit Charter states the following regarding the Audit Committee's responsibilities:

> - The Committee shall also discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the independent auditor under generally accepted auditing standards, including the matters required to be discussed by the Statement of Auditing Standards ("SAS") No. 100.
>
> - The Committee shall review with management and the independent auditor the audited financial statements and the MD&A to be included in the Company's Annual Report on Form 10-K prior to the filing of such report.
>
> - The Committee shall discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditor under generally accepted auditing standards, including the matters required to be discussed by SAS No. 61, and shall be responsible for recommending to the full Board the inclusion of the Company's audited financial statements in the Form 10-K.
>
> [* * *]
>
> - In connection with its review of the financial statements and MD&A to be included in the Company's quarterly reports on Form 10-Q and Annual Reports on Form 10-K, the Committee shall discuss with management and the independent auditor their qualitative judgments about the appropriateness, and not just the acceptability, of accounting principles and financial disclosure practices used or proposed to be adopted by the Company, the reasonableness of significant judgments, including a description of any transactions as to which the management obtained Statement on Auditing Standards No. 50 communications, and the clarity of disclosures in the financial statements, including

the Company's disclosures of critical accounting policies and other disclosures under "MD&A".

[* * *]

- The Committee shall discuss with management, internal auditors and the independent auditor of the Company's system of internal controls, the Company's critical accounting principles and any significant issues related to financial statements presentations, including any changes in the Company's critical accounting policies and the effects of alternative GAAP methods, off-balance sheet structures and regulatory and accounting initiatives.

- The Committee shall review and discuss with management, internal auditors and independent auditors the Company's significant financial and other exposures, including material pending legal proceedings and other material contingent liabilities, and guidelines and policies relating to enterprise risk assessment and risk management, including the Company's procedures for monitoring and controlling such risks.

[* * *]

- The Committee shall consider and review with management, the independent auditors and the Company's internal auditors any significant internal control deficiencies or material weaknesses communicated by the independent auditors together with management responses thereto and the remediation thereof.

- The Committee shall review and discuss with management earnings press releases and financial information and earnings guidance provided to analysts and rating agencies.

[* * *]

- In connection with and prior to giving their required certifications, the Company's Chief Executive Officer and Chief Financial Officer must disclose to the independent auditors and the Committee all significant deficiencies and material weaknesses in the design or operation of internal controls, and any fraud that involves management or other employees who have a significant role in the Company's internal controls.

- The Committee shall maintain procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing

matters, and the confidential, anonymous submissions by employees or contractors of concerns regarding questionable accounting or auditing matters.

[* * *]

- The Committee shall review management's plan for assuring compliance with the Company's Code of Conduct and other Company programs designed to promote regulatory compliance and ethical business conduct.

[* * *]

- The Committee shall seek to ensure open communication among internal auditors, independent auditors, management and the Board.

79. While the Audit Committee was responsible for ensuring that the Company had adequate internal controls regarding the accuracy of the Company's financial disclosures and the Company's communications with the public, it failed to fulfill this responsibility. In fact, the Audit Committee Defendants harmed the Company by taking part in the publishing of false and misleading statements and/or omissions of material fact described herein.

**The False and Misleading Proxy Statement**

80. In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue a false and misleading proxy statement, which was filed with the SEC on April 25, 2022 (the "**2022 Proxy**").

81. The 2022 Proxy recommended that shareholders vote to elect Defendants Bronfin, Burns, Cochran, Cocks, Gersh, Hamren, Jorgensen, Leinbach, Philip, Richie, Stoddart, West, and Higgins to serve the Board for a one-year term, and approve (on an advisory basis) the compensation of certain of the Company's executive officers. It also recommended that

shareholders vote to ratify KPMG as the Company's independent registered public accounting firm for the 2022 fiscal year.

82. The 2022 Proxy stated the following regarding the Board's role in risk oversight at the Company:

> The Board of Directors is actively involved in risk oversight for the Company. Although the Board as a whole has retained oversight over the Company's risk assessment and risk management efforts, the efforts of the various committees of the Board are instrumental in this process. Each committee, generally through its Chair, regularly reports back to the full Board on the conduct of the committee's functions. The Board, as well as the individual Board committees, also regularly speaks directly with key officers and employees of the Company involved in risk assessment and risk management.

83. The 2022 Proxy also stated the following regarding the Audit Committee's responsibilities:

> - Assists the Board in risk oversight for the Company by reviewing and discussing with management, internal auditors and the independent auditors the Company's significant financial and other exposures, and guidelines and policies relating to enterprise risk assessment and risk management, including the Company's procedures for monitoring and controlling such risks.
>
> - Oversees, on behalf of the Board, financial reporting, tax, and accounting matters, as well as the Company's internal controls over financial reporting.
>
> - Key role in oversight of the Company's compliance with legal and regulatory requirements.

84. The 2022 Proxy stated the following regarding the Company's Code of Conduct:

> Hasbro has a Code of Conduct which is applicable to all of the Company's officers, employees and directors, including the Company's Chief Executive Officer, Chief Financial Officer and Controller. The Code of Conduct addresses issues such as conflicts of interest, protection of confidential Company information, financial integrity, compliance with laws, rules and regulations, insider trading and proper public disclosure. Compliance with the

> Code of Conduct is mandatory for all Company officers, employees and directors. Any violation of the Code of Conduct can subject the person at issue to a range of sanctions, including dismissal.
>
> The Code of Conduct is available on Hasbro's website at https://hasbro.gcs-web.com/corporate-governance. The contents of our website are not incorporated by reference into this Proxy Statement. Although the Company generally does not intend to provide waivers of, or amendments to, the Code of Conduct for its Chief Executive Officer, Chief Financial Officer, Controller, or any other officers, directors or employees, information concerning any waiver of, or amendment to, the Code of Conduct for the Chief Executive Officer, Chief Financial Officer, Controller, or any other executive officer or director of the Company, will be promptly disclosed on the Company's website in the location where the Code of Conduct is posted.

85. Defendants Bronfin, Burns, Cochran, Cocks, Gersh, Hamren, Higgins, Jorgensen, Leinbach, Philip, Richie, Stoddart, and West caused the 2022 Proxy to be false and misleading by failing to disclose that (1) the risk oversight functions of the Board and its committees were not being performed as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) the Individual Defendants had violated the Code of Conduct with no consequences.

86. Defendants Bronfin, Burns, Cochran, Cocks, Gersh, Hamren, Higgins, Jorgensen, Leinbach, Philip, Richie, Stoddart, and West caused the 2022 Proxy to be false and misleading by failing to disclose that: (i) the Company's inventories were not of "good quality"; (ii) Hasbro's inventories far exceeded customer demand; (iii) Hasbro struggled to manage its excess inventory; (iv) demand for the Company's products was temporarily inflated at the start of the COVID-19 pandemic and, once people started returning to school and work, customer demand stagnated; (v) the Company's high inventory levels throughout the Relevant Period were not an accurate reflection of underlying demand; and (vi) as a result of the foregoing, positive statements

concerning the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

87. As a result of the Company's false and misleading statements in the 2022 Proxy, the Company's stockholders made uninformed decisions when voting to reelect the above defendants as proposed in the 2022 Proxy.

## BREACHES OF DUTIES

88. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Hasbro, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

89. The Individual Defendants breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Hasbro substantial damage.

90. The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making improper statements detailed herein, and failing to properly oversee Hasbro's public statements and internal control functions.

91. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Hasbro, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class

Action, which alleges violations of federal securities laws. As a result, Hasbro has expended, and will continue to expend, significant sums of money.

## NEITHER THE STATUTORY "SAFE HARBOR" NOR THE "BESPEAKS CAUTION" DOCTRINE APPLIES TO THE INDIVIDUAL DEFENDANTS' MISREPRESENTATIONS

92. Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("**PSLRA**") nor the judicially created "bespeaks caution" doctrine applicable to forward looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

93. Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded herein, because, at the time each such statement was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Hasbro or an Individual Defendant who knew that the statement was materially false or misleading when made. None of the historic or present tense statements made by the Individual Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or state of future economic performance when made, nor were any of the projections or forecasts made by

the Individual Defendants expressly related to, or stated to be dependent on, those historic or present tense statement when made.

## DAMAGES TO HASBRO

94. As a direct and proximate result of the Individual Defendants' conduct, Hasbro has expended and will continue to expend significant sums of money.

95. Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action of amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

96. As a direct result of the Individual Defendants' conduct, Hasbro has suffered and will continue to suffer a loss of reputation and goodwill and a "liar's discount" that will plague the Company's stock price in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97. Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

98. Plaintiff brings this action derivatively and for the benefit of Hasbro to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Hasbro, unjust enrichment, and violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act.

99. Hasbro is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

100. Plaintiff is, and has been continuously at all relevant times, a stockholder of Hasbro. Plaintiff will adequately and fairly represent the interests of Hasbro in enforcing and prosecuting

its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

101. A pre-suit demand on the Board of Hasbro is futile, and, therefore, excused. At the time of filing this action, the Board consists of 11 directors: Individual Defendants (i) Cocks, (ii) Stoddart, (iii) Cochran, (iv) Gersh, (v) Hamren, (vi) Jorgensen, (vii) Richie, and (viii) West, as well as non-parties (ix) Gibeau, (x) Harris, and (xi) Mahoney (the "**Demand Board**"). Plaintiff needs only to allege demand futility as to a majority of the directors (*i.e.*, six directors) who are on the Board at the time this action is commenced.

102. Plaintiff did not make a demand on the Demand Board prior to bringing the stockholder derivative suit because, as set forth below, a majority of the Demand Board faces a substantial likelihood of personal liability and is incapable of making an independent and disinterested decision to bring the claims herein.

**A. The Board Faces a Substantial Likelihood of Liability**

103. Demand is excused as to all eight Individual Defendants on the Demand Board because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make the false and misleading statements described herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. The Demand Board defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested. Accordingly, demand upon them is futile and, thus, excused.

104. The Demand Board defendants, together and individually, violated and breached their fiduciary duties by knowingly approving and/or permitting the wrongs alleged herein and participating in efforts to conceal those wrongs.

105. Additionally, the Demand Board defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

106. The Demand Board defendants, as members of the Board, were and are subject to Hasbro's Code of Conduct. The Demand Board defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Demand Board defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore, demand upon them is futile.

107. Moreover, the Audit Committee Defendants solicited the 2022 Proxy. The 2022 Proxy was false and misleading in violation of Section 14(a) of the Exchange Act. Therefore, demand upon them is futile and further excused.

**B. Additional Demand Futility Allegations**

108. Demand is further excused as to Defendant Cocks. The principal professional occupation of Defendant Cocks is his employment as the CEO of Hasbro, pursuant to which he has received and continues to receive substantial monetary compensation as alleged above. Defendant Cocks has also served as a Company director since February 2022. Accordingly, Defendant Cocks lacks independence from the other members of the Demand Board due to his interest in maintaining his executive position at Hasbro. As such Defendant Cocks cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Cocks render him incapable of impartially considering a demand

commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Cocks breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Cocks is futile and excused.

109. Demand is further excused as to Defendant Stoddart. Defendant Stoddart has served as a Company director since 2014 and as Chair of the Board of Directors since 2022. The Company provides Defendant Stoddart with significant compensation for his role as stated above. As such, Defendant Stoddart cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Stoddart render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Stoddart breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Stoddart is futile and excused.

110. Demand is further excused as to Defendant Cochran. Defendant Cochran has served as a Company director since 2016. The Company provides Defendant Cochran with significant compensation for her role as stated above. As such, Defendant Cochran cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by

Defendant Cochran render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Cochran breached her fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Cochran is futile and excused.

111. Demand is further excused as to Defendant Gersh. Defendant Gersh has served as a Company director since 2010. The Company provides Defendant Gersh with significant compensation for her role as stated above. As such, Defendant Gersh cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Gersh render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Gersh breached her fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Gersh is futile and excused.

112. Demand is further excused as to Defendant Hamren. Defendant Hamren has served as a Company director since 2022. The Company provides Defendant Hamren with significant compensation for her role as stated above. As such, Defendant Hamren cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by

Defendant Hamren render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Hamren breached her fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Hamren is futile and excused.

113. Demand is further excused as to Defendant Jorgensen. Defendant Jorgensen has served as a Company director since 2022. The Company provides Defendant Jorgensen with significant compensation for his role as stated above. As such, Defendant Jorgensen cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Jorgensen render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Jorgensen breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Jorgensen is futile and excused.

114. Demand is further excused as to Defendant Richie. Defendant Richie has served as a Company director since 2020. The Company provides Defendant Richie with significant compensation for her role as stated above. As such, Defendant Richie cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because

that would expose her to liability. This lack of independence and the financial benefits received by Defendant Richie render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Richie breached her fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Richie is futile and excused.

115. Demand is further excused as to Defendant West. Defendant West has served as a Company director since 2016. The Company provides Defendant West with significant compensation for her role as stated above. As such, Defendant West cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability. This lack of independence and the financial benefits received by Defendant West render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant West breached her fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant West is futile and excused.

116. Furthermore, Defendants Cochran, Gersh, and Jorgensen have served as members of the Audit Committee during the Relevant Period. As such, they are responsible for the integrity Hasbro's financial statements. Specifically, the Audit Charter provides that the Audit Committee is responsible for:

> (a) appoint the independent auditor and oversee the independent auditor's work, (b) prepare the report required to be included in the

> Company's annual proxy statement by the rules of the Securities and Exchange Commission and (c) assist the Board of Directors (the "Board") of the Company in its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications and independence, and (iv) the performance of the Company's internal audit function and independent auditor.
>
> In discharging its oversight role, the Committee is empowered to investigate any matter with full access to all books, records, facilities and personnel of the Company and the power to retain outside counsel, auditors or other experts for this purpose. The Board and the Committee are in place to represent the Company's shareholders; accordingly, the independent auditor is ultimately accountable to the Board and the Committee.
>
> The Committee shall review and reassess the adequacy of this Charter on an annual basis.

117. In their capacities as Audit Committee members, Defendants Cochran, Gersh and Jorgensen reviewed and approved materially misleading statements and allowed them to be disseminated in Hasbro's SEC filings and other disclosures. Thus, Defendants Cochran, Gersh and Jorgensen breached their fiduciary duties, are not disinterested, and demand is excused as to them for this additional reason.

## **<u>FIRST CLAIM</u>**

### **Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

118. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

119. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of,

or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

120. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

121. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

122. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2022 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

123. The false and misleading elements of the 2022 Proxy led to the re-elections of several of the Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to Hasbro.

124. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omission in the 2022 Proxy.

125. Plaintiff, on behalf of Hasbro, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

126. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

127. The Individual Defendants, by virtue of their positions with Hasbro and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Hasbro and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Hasbro to engage in the illegal conduct and practices complained of herein.

128. Plaintiff, on behalf of Hasbro, has no adequate remedy at law.

## THIRD CLAIM

**Against Individual Defendants**
*for Breach of Fiduciary Duties*

129. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

130. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Hasbro's business and affairs as directors and/or officers of the Company.

131. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the

misconduct described herein.

132. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

133. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

134. The Individual Defendants engaged in a substantial and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

135. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the

price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

136. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

137. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hasbro has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

138. Plaintiff, on behalf of Hasbro, has no adequate remedy at law.

## FOURTH CLAIM

**Against Individual Defendants**
*for Unjust Enrichment*

139. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

140. By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Hasbro.

141. The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Hasbro tied to the performance or artificially inflated valuation of Hasbro, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

142. Plaintiff, as a stockholder and a representative of Hasbro, seeks restitution from the

Director Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

143. Plaintiff, on behalf of Hasbro, has no adequate remedy at law.

## FIFTH CLAIM

**Against Individual Defendants**
*for Violations of 10(b) of the Exchange Act and SEC Rule 10(b)-5*

144. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

145. During the Relevant Period, the Individual Defendants disseminated or approved materially false and misleading public statements and failed to disclose that: (i) the Company's inventory was not of "good quality"; (ii) Hasbro's inventory far exceeded customer demand; (iii) Hasbro struggled to manage its excess inventory; (iv) demand for the Company's products was temporarily inflated at the start of the COVID-19 pandemic and, once people started returning to school and work, customer demand stagnated; and (v) the Company's high inventory levels throughout the Relevant Period were not an accurate reflection of underlying demand. As a result, positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing financial harm to the Company.

146. During the Relevant Period, the Individual Defendants caused the Company to overpay by nearly $56 million to repurchase roughly 1.4 million shares.

147. As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the truth about Hasbro's inventory levels, their control over Hasbro's allegedly materially misleading statements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Hasbro, participated in the fraudulent scheme alleged herein.

148. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the time in issue without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

149. The Individual Defendants were among the senior management and the directors of the Company during the Relevant Period. Based on their roles at the Company, the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

150. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at

the Company, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

151. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operation of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

152. As such, the Individual Defendants caused the Company to violate Section 10(b) of the Exchange Act and SEC Rule 10(b)-5 in that they:

(a) Employed devices, schemes, and artifices to defraud; and

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made, not misleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Hasbro, and that Plaintiff is an adequate representative of the Company;

B. Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

C. Determining and awarding to Hasbro the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D. Directing Hasbro and the Individual Defendants to take all necessary

actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Hasbro and its stockholders from a repeat of the damaging events described herein;

E. Awarding Hasbro restitution from Individual Defendants;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court may deem just and proper.

Dated: February 21, 2025

**LEVI & KORSINSKY, LLP**

*/s/ Correy A. Suk*
Gregory M. Nespole
Daniel Tepper
Correy A. Suk
Sidharth Kakkar
33 Whitehall Street, 17th Floor
New York, NY 10004
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com
skakkar@zlk.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Patrick Ayers, do hereby verify that I am a holder of stock of Hasbro, Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint (the "Complaint"). I have reviewed and authorized the filing of the Complaint. All of the averments in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 21, 2025

Patrick Ayers
Patrick Ayers (Feb 21, 2025 10:23 EST)

Patrick Ayers